## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| LEON BENSON and KOLLEEN BUNCH, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. 1:24-cv-00839 JPH-MJD |
| CITY OF INDIANAPOLIS, ALAN F. JONES, LESLIE VANBUSKIRK, STEVEN GARNER, ELI MCALLISTER, and COLUMBUS RICKS, in their individual capacities, | ) |
| | ) |
| Defendants. | ) |

### Defendants City of Indianapolis, Leslie VanBuskirk, Steven Garner, Eli McAllister, and Columbus Ricks' Answer and Defenses

Defendants City of Indianapolis, Leslie VanBuskirk, Steven Garner, Eli McAlister, and Columbus Ricks, by counsel, for their Answer to Plaintiffs' Complaint, state as follows:

### Introduction

1.      On August 8, 1998, Joseph "Looney" Webster killed Kasey Schoen.

**ANSWER:**     Defendants deny the allegations in this paragraph of Plaintiff's Complaint.

2.      To this day, Webster has never been held accountable for the senseless murder he committed and the decades-long trauma and untold damage he inflicted on the Schoen family.

**ANSWER:**     Defendants deny the allegations in this paragraph.

3.      Webster has never been held accountable, in part, because Defendants successfully framed Plaintiff, Leon Benson, for the murder.

**ANSWER:**     Defendants deny the allegations in this paragraph.

4.      Mr. Benson, who has always maintained his innocence, spent 24 years wrongfully imprisoned due to Defendants' egregious misconduct.

**ANSWER:**      Defendants deny the allegations in this paragraph.

5.      Defendants' misconduct caused irreparable harm to both the Benson and Schoen families.

**ANSWER:**      Defendants deny the allegations in this paragraph.

6.      While serving out his sentence, Mr. Benson was forced to spend over a decade in solitary confinement because of Defendants' egregious misconduct. That injustice stems directly from the Defendants' unlawful actions that caused Mr. Benson's wrongful conviction and imprisonment.

**ANSWER:**      Defendants deny that Benson was forced to spend any time in prison due to any misconduct by Defendants. Defendants lack knowledge or information sufficient to form a belief about the truth of any other allegations in this paragraph and therefore deny the same.

7.      Among other misconduct discussed herein, Defendants withheld critical exculpatory evidence that would have made all the difference to the outcome of Mr. Benson's trial given that the State's case against Mr. Benson—built by IPD Detective Alan Jones and Detective Leslie VanBuskirk—was incredibly weak; so much so that Mr. Benson's first trial ended in a mistrial with six jurors voting not guilty.

**ANSWER:**      Defendants deny the allegations in this paragraph.

8.      No physical evidence has ever linked Mr. Benson to the crime.

**ANSWER:**      Defendants lack knowledge or information sufficient to form a belief about the truth of any other allegations in this paragraph and therefore deny the same.

9.      Defendants have never provided a motive for Mr. Benson to have committed the murder of Kasey Schoen.

**ANSWER:**     Defendant state that a "motive" is not an element required to prove murder in Indiana. Defendants lack knowledge or information sufficient to form a belief about the truth of any other allegations in this paragraph and therefore deny the same.

10.     That's because there is none.

**ANSWER:**     Defendants deny the allegations in this paragraph.

11.     Defendants' egregious misconduct, which included the withholding of crucial exculpatory evidence – was the linchpin in securing Mr. Benson's wrongful murder conviction, 60 year sentence, and 24-years of wrongful imprisonment.

**ANSWER:**     Defendants deny the allegations in this paragraph.

12.     Almost a quarter-century later, a year-long collaborative reinvestigation between the University of San Francisco Racial Justice Clinic (USF RJC) and the Marion County Prosecutor's Office Conviction Integrity Unit (MCPO CIU) uncovered that the IPD withheld critical, exculpatory evidence that implicated another person—Joseph "Looney" Webster—as Schoen's true killer.

**ANSWER:**     Defendants deny that they withheld exculpatory information regarding Joseph "Looney" Webster, as Webster was investigated and his identity disclosed to defense counsel. Defendants deny that Joseph "Looney" Webster" was the true killer. Defendants lack knowledge or information sufficient to form a belief about the truth of any other allegations in this paragraph and therefore deny the same.

13.     That investigation revealed that IPD fabricated and manipulated evidence to conceal Webster's culpability, willfully ignored evidentiary leads pointing to Webster, failed to preserve other critical exculpatory evidence, and failed to turn over evidence in its possession that pointed to Webster as the murderer, not Benson.

**ANSWER:**     Defendants deny that they withheld exculpatory information regarding Joseph "Looney" Webster, as Webster was investigated and his identity disclosed to defense counsel. Defendants deny that Joseph "Looney" Webster" was the true killer. Defendants lack knowledge or information sufficient to form a belief about the truth of any other allegations in this paragraph and therefore deny the same.

14.    These assertions are not just allegations.

**ANSWER:**    Defendants deny the allegations in this paragraph.

15.    In May 2022, Det. Alan Jones signed a sworn declaration.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of any allegations in this paragraph and therefore deny the same.

16.    In that declaration, Defendant Jones admits that critical exculpatory evidence was never turned over to Mr. Benson or to the Marion County Prosecutor's Office in 1998.

**ANSWER:**    Defendants deny that they withheld "critical exculpatory evidence." Defendants lack knowledge or information sufficient to form a belief about the truth any other allegations in this paragraph and therefore deny the same.

17.    Defendant Jones also admits in that declaration that failing to disclose such evidence was his routine practice.

**ANSWER:**    Defendants deny that they withheld "critical exculpatory evidence." Defendants deny that withholding exculpatory information was a "routine practice." Defendants lack knowledge or information sufficient to form a belief about the truth any other allegations in this paragraph and therefore deny the same.

18.    Defendant Jones' admissions to having a practice of not disclosing exculpatory evidence is representative of Defendant City's failure to train, supervise, and discipline officers. Defendant City's failure to train, supervise, and discipline officers on critical police functions led to the predictable consequence of wrongfully convicting innocence men and women like Mr. Benson.

**ANSWER:**    Defendants deny the allegations in this paragraph.

19.    Fortunately, the injustice against Mr. Benson unraveled in December 2022 when he sought relief from the Marion County Superior Court on the basis that his due process rights were violated and that the evidence pointed so compellingly to his innocence that his conviction must be overturned.

**ANSWER:**     Defendants admit only that Benson's conviction was overturned. Defendants the other allegations in this paragraph.

20.     Both the Marion County Prosecutor's Office and the Court agreed.

**ANSWER:**     Defendants admit only that the Marion County Superior Court overturned Benson's conviction following a Petition for Post-Conviction Relief, a Response, and the Order granting that petition, all filed on March 8, 2023. Defendants deny any other allegations in this paragraph, and, more specifically, deny that the Defendants were parties to or represented in that litigation.

21.     The Marion County Prosecutor's Office admitted, and the Court held, that the undisclosed evidence from IPD was exculpatory, that it was withheld in violation of settled case law in Brady v. Maryland, and that the effect of withholding the evidence resulted in a violation of Mr. Benson's constitutional rights.

**ANSWER:**     Defendants admit only that the Marion County Superior Court overturned Benson's conviction following a Petition for Post-Conviction Relief, a Response, and the Order granting that petition, all filed on March 8, 2023. Defendants deny any other allegations in this paragraph, and, more specifically, deny that Defendants were parties to or represented in that litigation.

22.     In March 2023, the Court granted Mr. Benson's Amended Petition for Post-Conviction Relief and vacated his conviction.

**ANSWER:**     Defendants admit only that the Marion County Superior Court overturned Benson's conviction following a Petition for Post-Conviction Relief, a Response, and the Order granting that petition, all filed on March 8, 2023. Defendants deny any other allegations in this paragraph, and, more specifically, deny that Defendants were parties to or represented in that litigation.

23.     The MCPO then dismissed the charges with prejudice.

**ANSWER:**     Defendants admit only that the MCPO dismissed the charges. Defendants deny any other allegations in this paragraph, and, more specifically, deny that Defendants were parties to or represented in that litigation.

24.     On March 9, 2023, Mr. Benson walked out of prison a free and fully exonerated man.

**ANSWER:**    Defendants admit only that Benson was released from prison. Defendants deny any other allegations in this paragraph, and, more specifically, deny that Defendants were parties to or represented in that litigation. Further, Plaintiff included a photograph under this paragraph and, to the extent that Plaintiff asks Defendants to admit or deny this photograph, Defendants deny the same.

25.    Rather than accept responsibility for framing Mr. Benson, and for failing to bring justice to Kasey Schoen's true killer, members of the Indianapolis Metropolitan Police Department (IMPD) joined the decades-long conspiracy to conceal the egregious misconduct that led to Mr. Benson's wrongful conviction.[1]

**ANSWER:**    Defendants deny the allegations in this paragraph.

26.    As part of the conspiracy to conceal past misconduct and protect the other Defendants from civil liability, Defendants Columbus Ricks and Eli McCallister doubled down on misconduct committed by past colleagues, defamed Mr. Benson, maligned the prosecutor's office, and retraumatized Kasey Schoen's family.

**ANSWER:**    Defendants deny the allegations in this paragraph.

27.    After Mr. Benson's exoneration, Defendants Ricks and McCallister purported to conduct a "re-investigation" of the Schoen homicide.

**ANSWER:**    Defendants admit only that Defendnts Ricks and McCallister reviewed the homicide investigation. Defendants deny any other allegations in this paragraph.

28.    During this time, Defendants Ricks and McCallister gained unfettered access to the Schoen family, including Kasey's sister, Plaintiff Kolleen Bunch.

**ANSWER:**    Defendants admit only that Defendnts Ricks and McCallister had the ability to contact Plaintiff Kolleen Bunch. Defendants deny any other allegations in this paragraph.

---

[1] The IMPD is the successor organization of the IPD.

29.    Defendants Ricks and McCallister did not conduct a legitimate "re¬investigation" of the Schoen homicide.

**ANSWER:**    Defendants deny the allegations in this paragraph.

30.    Instead, they entered a conspiracy with the other Defendants to conceal past misconduct, protect Defendant City and other Defendants from civil liability, and shield Joseph Webster from criminal prosecution.

**ANSWER:**    Defendants deny the allegations in this paragraph.

31.    As part of this conspiracy, Defendants Ricks and McAllister agreed not to conduct a legitimate investigation into Joseph Webster.

**ANSWER:**    Defendants deny the allegations in this paragraph.

32.    Defendants' decision not to investigate Webster had the added benefit of protecting convictions that were gained through law enforcement's use of Webster as an informant.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

33.    As part of this conspiracy, Defendants Ricks and McCallister made deliberate and overt acts. Defendants' actions were designed to manipulate the victim's family into challenging Mr. Benson's exoneration and the legitimacy of the Marion County CIU.

**ANSWER:**    Defendants deny the allegations in this paragraph.

34.    Defendants understood that if they successfully manipulated the victim's family into challenging the legitimacy of Plaintiff's exoneration and the Marion County CIU, that additional wrongful convictions caused by IPD and IMPD officers would be concealed from the public eye.

**ANSWER:**    Defendants deny that the conviction of Leon Benson was wrongful. Defendants deny any other allegations in this paragraph.

35.    As part of this conspiracy, Defendants intended to conceal and protect past IPD and IMPD officers' misconduct from coming to light and to prevent additional wrongfully convicted individuals from being exonerated.

**ANSWER:**    Defendants deny the allegations in this paragraph.

36.    Defendants' conspiracy had the benefit of not only protecting other law enforcement Defendants, but also, Defendant City from being subjected to civil litigation.

**ANSWER:**    Defendants deny the allegations in this paragraph.

37.    As part of this conspiracy, Defendants Ricks and McCallister made outrageous and offensive statements to Ms. Bunch that caused her serious emotional harm and distress.

**ANSWER:**    Defendants deny the allegations in this paragraph.

38.    As part of this conspiracy, Defendants Ricks and McCallister made defamatory statements against Mr. Benson.

**ANSWER:**    Defendants deny the allegations in this paragraph.

39.    Plaintiff, Kolleen Bunch, the sister of Kasey Schoen, has suffered immensely in the twenty-five years following the murder of her younger brother.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

40.    In that time, what she and her family wanted more than anything was for the person who murdered Kasey to be brought to justice.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

41.    As described herein, the IMPD has no intention of conducting a legitimate investigation into the murder of Ms. Bunch's brother.

ANSWER:    Defendants deny the allegations in this paragraph.

42.    Instead, members of the IMPD have joined the conspiracy to frame Mr. Benson and to cover up their colleagues' past misconduct .

ANSWER:    Defendants deny the allegations in this paragraph.

43.    This lawsuit seeks to hold defendants accountable for their conduct and to ensure it will never occur again.

ANSWER:    Defendants admit only Plaintiffs have filed a lawsuit. Defendants deny any other allegations in this paragraph, and, more specifically, deny that they violated any state or federal laws.

## Jurisdiction

44.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

ANSWER:    Defendants admit only that the Complaint purports to state a claim under 42 U.S.C. Section 1983 to redress deprivation of federal rights. Defendants deny any other allegations in this paragraph of the Complaint and, more specifically, deny that they violated any state or federal laws.

45.    This court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of their state-law claims pursuant to U.S.C. § 1367.

ANSWER:    Defendants admit only that this court has jurisdiction pursuant to 28 U.S.C. Section 1331 and 28 U.S.C. Section 1367. Defendants deny any other allegations in this paragraph of the Complaint and, more specifically, deny that they violated any state or federal laws.

46.    Venue is proper under 28 U.S.C. § 1391(b). The Defendants reside in this district and the events and omissions giving rise to Plaintiffs' claims occurred in this district.

ANSWER:    Defendants admit only that venue is proper in the Southern District of Indianapolis, Indianapolis Division. Defendants deny any other allegations in this paragraph of the Complaint and, more specifically, deny that they violated any state or federal laws.

## Parties

47.    At all times relevant hereto, prior to his wrongful conviction, Plaintiff Leon Benson was a resident of the State of Indiana and of Marion County.

**ANSWER:**    Defendants deny Benson was wrongfully convicted. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

48.    At all times relevant hereto, Plaintiff Kolleen Bunch was a resident of the State of Indiana and Hendricks County.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

49.    The 1998 shooting death of Kasey Schoen was investigated by the Indianapolis Police Department (IPD). Upon information and belief, IPD was the principal law enforcement agency of Indianapolis, Indiana under the jurisdiction of the City of Indianapolis in 1998 throughout the investigation of the shooting death of Kasey Schoen.

**ANSWER:**    Defendants admit that the death of Kasey Schoen was investigated by the Indianapolis Police Department (IPD). Defendants also admit that IPD was a law enforcement agency, as defined by Indiana law, that served the Consolidated City of Indianapolis-Marion County ("City"). Defendants deny that IPD was the "principal" law enforcement agency of the City. Defendants state that both IPD, the Marion County Sheriff's Office Law Enforcement Division and other law enforcement agencies provided services to the City. Defendants deny any other allegations in this paragraph.

50.    In 2007, the Indianapolis Metropolitan Police Department (IMPD) was established by General Ordinance 110, consolidating the former Indianapolis Police Department (IPD) with the law enforcement division of the Marion County Sheriff's Division. In 2016, IMPD was established as a department of the City of Indianapolis.

**ANSWER:**    To the extent that this paragraph states IMPD's status under Indiana law as a non-suable department of the City, this is a legal conclusion and no response is required. Defendants admit that the IMPD was established by General Ordinance and that it was

created by the merger of IPD and the Marion County Sheriff's Office Law Enforcement Division on January 1, 2007. Defendants deny any other allegations in this paragraph.

51.    At all times relevant hereto, Defendants Alan F. Jones, Leslie VanBuskirk, Steven Garner, Eli McAllister, and Columbus Ricks (hereinafter "Defendant Officers") were police officers in the Indianapolis Police Department (IPD) or its successor the Indianapolis Metropolitan Police Department (IMPD). All are sued in their individual capacities, and acted under color of law and within the scope of their employment at the times of their misconduct in this case.

> **ANSWER:**    To the extent that this paragraph states the capacity in which Plaintiffs sue them, this is a legal conclusion and no response is required. Defendants admit that Alan Jones, Leslie VanBuskirk, Steven Garner, Eli McAllister, and Columbus Ricks are all police officers who served either with IPD or IMPD. Defendants deny any other allegations in this paragraph.

52.    Defendant City of Indianapolis is a municipal corporation under the laws of the State of Indiana. The City of Indianapolis is liable for all torts committed by the Defendant Officers while employed by the City of Indianapolis pursuant to the doctrine of respondeat superior. Defendant City of Indianapolis is additionally responsible for the official policies of the IPD and its successor the IMPD. The City of Indianapolis is or was the employer of each of the Defendant Officers.

> **ANSWER:**    To the extent that this paragraph restates state or federal law, this is a legal conclusion and no response is required. Defendants admit that the City is a consolidated city and a political subdivision of the State of Indiana. Defendants admit that Alan Jones, Leslie VanBuskirk, Steven Garner, Eli McAllister and Columbus Ricks were at certain times City employees. Defendants deny any other allegations in this paragraph.

## The Crime

53.    On August 8, 1998, at approximately 3:30 a.m., Kasey Schoen was shot five times with a .380 handgun while sitting in his truck on the 1300 block of Pennsylvania Avenue in Indianapolis, Indiana.

**ANSWER:**    Defendants admit that Kasey Schoen was shot and killed on or about August 8, 1998 while sitting in his truck in the area of the 1350 N. Pennsylvania Avenue in Indianapolis, Indiana. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

54.    Schoen's truck was stopped outside a building that housed a facility known as the Damien Center.

**ANSWER:**    Defendants admit that Schoen's truck was located in the area of 1350 N. Pennsylvania Avenue in Indianapolis. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

55.    IPD detectives arrived at the scene and interviewed eyewitness Christy Schmitt, a newspaper carrier who was approximately 150 away from Schoen's truck at the time of the shooting.

**ANSWER:**    Defendants admit that IPD detectives arrived at the scene of the shooting and interviewed potential witnesses, including Christy Schmitt. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

56.    In a statement to Defendant VanBuskirk shortly after the shooting, Schmitt explained that, at approximately 3:30 a.m., she was filling the newspaper box near 14th Street and N. Pennsylvania Avenue. Schmitt said she noticed Schoen's truck, with the brake lights on, in front of the Damien Center. She could see someone inside the truck and a Black man standing on the sidewalk by the passenger side window.

**ANSWER:**    Defendants admit that Detective VanBuskirk took a statement from Schmitt on or about August 8, 1998. Defendants state that Schmitt's statement was recorded and that statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

57.    Schmitt advised that, as she was filling the newspaper box, she heard gunshots. She looked up to see the man who had been standing by the truck "head in her direction," then stop and "fire[] a couple more shots" into the vehicle.

12

**ANSWER:**    Defendants admit that Detective VanBuskirk took a statement from Schmitt on or about August 8, 1998. Defendants state that Schmitt's statement was recorded and that statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

58.    Schmitt stated that the man ran south on Pennsylvania, around the building, and into parking lot. She said she initially started to drive away as she called 911 on her cell phone, but she then backed up and drove in reverse back to the scene.

**ANSWER:**    Defendants admit that Detective VanBuskirk took a statement from Schmitt on or about August 8, 1998. Defendants state that Schmitt's statement was recorded and that statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

59.    It was difficult for Schmitt to get a clear view of the shooting due to the lighting conditions and distance.

**ANSWER:**    Defendants deny the allegations in this paragraph.

60.    Schmitt told Defendant VanBuskirk that the shooter "never got into the streetlight" and that "this happened kind of quick."

**ANSWER:**    Defendants admit that Detective VanBuskirk took a statement from Schmitt on or about August 8, 1998. Defendants state that Schmitt's statement was recorded and that statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

61.    During this interview with Defendant VanBuskirk, Schmitt described the shooter as a dark-complected, Black male, 5'8" tall, in his early to mid-20s.

**ANSWER:**    Defendants admit that Detective VanBuskirk took a statement from Schmitt on or about August 8, 1998. Defendants state that Schmitt's statement was recorded and that statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

62.     Significantly, when asked what was "the most distinctive feature" that she remembered about the shooter, Schmitt described the shooter's clothing. She stated: "He was wearing a black tee shirt, black sweat[]pants with three narrow white stripes down the legs..."

**ANSWER:**    Defendants admit that Detective VanBuskirk took a statement from Schmitt on or about August 8, 1998. Defendants state that Schmitt's statement was recorded and that statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

63.     The neighborhood where Schoen was murdered was known for having a high crime rate, and as a place where illegal drugs were routinely bought, sold, and used.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

64.     It was also known at the time for having a number of gay bars, including The Varsity Lounge.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

65.     Early in the investigation, IPD detectives learned that a few people close to Schoen suspected that he might be gay, though Schoen had never disclosed his sexual orientation to his family.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

66.     The bartender at The Varsity Lounge recognized Schoen from a photograph and said he was a repeat customer.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

**Initial Evidence Pointed to Joseph "Looney" Webster—NOT Leon Renson—as the Shooter, But IPD Withheld this Evidence**

67.    Defendant Alan Jones was the lead detective investigating Schoen's murder.

**ANSWER:**    Defendants admit that Detective Alan Jones was assigned as a detective to the investigation. Defendants deny any other allegations in this paragraph.

68.    Early in the investigation, on August 10, 1998, Defendant Jones met with Det. Randy West, who advised that his Confidential Informant ("CI") told him that on the morning of the shooting there were three subjects in the parking lot of the Damien Center "pitching" dope on the day of the shooting. One of them was a young Black man known as "Looney" who "[c]aught a pistol case at the [nearby] Academy Ap[artments] ~2-4 weeks [before]."

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

69.    Joseph "Looney" Webster was arrested in the area on July 12, 1998, just weeks before Schoen's murder, with "40 rocks of cocaine" and in possession of a .380 firearm, the same type of weapon he used to kill Schoen.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

70.    During that July stop, Webster was described wearing a "black jacket with two white stripes on each sleeve"—a close match to the description of the pants that Christy Schmitt stated Schoen's shooter was wearing.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

71.     On July 24, 1998, Webster was stopped in the area again by private security officer Derald K. Cooper across the street from the Academy Apartments— half a mile from the Schoen crime scene.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

72.     Defendant Jones was provided with this information and related documents implicating Webster in Schoen's murder.

**ANSWER:**     Defendants deny that the information identified by Plaintiff in the paragraphs above implicate Webster in Schoen's murder. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

73.     Defendant Jones knew within forty-eight hours of Schoen's murder that Joseph Webster was a viable suspect.

**ANSWER:**     Defendants deny the allegations in this paragraph.

74.     Det. West's note about Webster "pitching dope" in the Damien Center parking lot, Officer Cooper's report of the July 12 stop, and the probable cause affidavit related to Webster's second recent stop in the area were all facts known to police and documented in Det. Jones' file. None of this information was provided to Benson or his trial counsel.

**ANSWER:**     Defendants deny that Defendants or other police officers withheld information from Plaintiff's counsel. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

75.     Defendant Jones along with others at the IPD withheld this exculpatory evidence

from the Marion County Prosecutor's Office and Mr. Benson's counsel through trial.

**ANSWER:**    Defendants deny that Defendants or other police officers withheld
information from Plaintiff's counsel. Defendants lack knowledge or information sufficient to
form a belief about the truth of the other allegations in this paragraph and therefore deny the
same.


76.     On August 10, 1998, Defendant Jones spoke to Mariann Crosswright, the manager

of the nearby Academy Apartments, who also provided evidence implicating Joseph Webster. She

said, "[T]alk throughout the building is the police are looking for 'Looney' for the murder. 'Looney'

is Joseph [] Webster and he was arrested there in July for FAA & possession. He hangs around apts

113, 202, 309 & 414. Apt 414 is James Katz, possible relative."

**ANSWER:**    Defendants admit that Detective Jones interviewed various people as part of
the investigation, including people who identified Joseph Webster as "Looney" but this
information was disclosed to defense counsel. Defendants lack knowledge or information
sufficient to form a belief about the truth of the other allegations in this paragraph and
therefore deny the same.


77.     Defendant Jones withheld this exculpatory evidence from the Marion County

Prosecutor's Office and Mr. Benson's counsel through trial.

**ANSWER:**    Defendants deny that Defendants or other police officers withheld
information from Plaintiff's counsel. Defendants deny any other allegations in this paragraph.


78.     On August 11, 1998, Defendant Jones asked two IPD detectives to "check court at

0900 to see if Webster show[s] up" and instructed them to bring him to the homicide office for

questioning.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about
the truth of the allegations in this paragraph and therefore deny the same.

79.    Webster asked for his attorney and refused to speak to IPD.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

80.    After Webster refused to cooperate, Defendant Jones needed another suspect. The murder of a white victim by a Black suspect (a cross-racial murder) was highly unusual, and Defendant Jones was under unusually high pressure to solve the case.

**ANSWER:**    Defendants deny that "Defendant Jones needed another suspect" and denies that a "cross-racial murder" is "highly unusual." Defendants deny that Detective Jones was under "unusually high pressure to solve the case." Defendants deny any other allegations in this paragraph.

**Donald Brooks—A Repeat Criminal Offender with a History of Mental Health Issues—Allegedly Points to "Detroit" (Leon Benson) as the Shooter**

81.    Defendant Jones was searching for a new lead, but since the existing evidence pointed to Webster, all he had was a series of nicknames—people who had allegedly been in the neighborhood around the time of the murder. Jones needed one of the nicknames to pan out.

**ANSWER:**    Defendants deny that "all [Detective Jones] had was a series of nicknames" and deny "Jones needed one of the nicknames to pan out." Defendants deny the other allegations in this paragraph.

82.    The next name on his list after "Looney" was "Detroit."

**ANSWER:**    Defendants admit only that a person by the name of "Detroit" was a suspect in the shooting. Defendants deny he was the "next name on his list." Defendants deny any other allegations in this paragraph.

83.     Defendant Jones trolled the neighborhood, stopping people on the street in search of someone who could give him something on "Detroit," even though there was no evidence that "Detroit" was involved in the shooting.

> **ANSWER:**    Defendants deny that there was "no evidence that 'Detroit' was involved in the shooting" as eyewitnesses identified "Detroit" as being involved. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

84.     He eventually found someone—the perfect someone—Donald Brooks. Mr. Brooks had a lengthy criminal history, had been adjudicated "mentally ill" as of April 1993, and had a grudge against Leon Benson (whom he knew as "Detroit.)

> **ANSWER:**    Defendants deny that Brooks was a "perfect someone" as implied by Plaintiff's allegations. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

85.     Defendants used Mr. Brooks to fabricate evidence against Leon Benson.

> **ANSWER:**    Defendants deny the allegations in this paragraph.

86.     Based on Mr. Brooks' fabricated account, IPD officers detained Leon Benson and brought him down to the police station for questioning.

> **ANSWER:**    Defendants deny that Brooks fabricated any account for Defendants and deny that they arrested or otherwise illegally detained Benson without probable cause. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

87.     At the same time that Mr. Benson was being detained and held at the police station, Defendant Jones invited Christy Schmitt to come to the station.

**ANSWER:**    Defendants admit only that Benson was questioned and that Schmitt was invited to come to IPD for purposes of the investigation. Defendants deny that they arrested or otherwise illegally detained Benson without probable cause.  Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

88.    Defendant Jones conducted an unduly suggestive identification procedure that resulted in the identification of Leon Benson.

**ANSWER:**    Defendants admit only that Schmitt identified Benson in a photo array. Defendants deny that Detective Jones conducted an unduly suggestive identification procedure. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

89.    Defendant Jones failed to record the identification procedures and declined to document the unduly suggestive identification process that he used with Ms. Schmitt.

**ANSWER:**    Defendants deny that Detective Jones conducted any unduly suggestive identification and deny that Detective Jones failed to record or document the identification procedures. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

90.    The unduly suggestive identification process resulted in the misidentification of Mr. Benson whose appearance did not fit the description that Schmitt gave immediately after the shooting.

**ANSWER:**    Defendants deny that Detective Jones conducted any unduly suggestive identification, deny that Benson did not fit the description, and deny that Benson was misidentified. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

**Leon Benson Provides a Statement to Police Putting Himself Near the Crime Scene on August 8, 1998**

91.    After Schmitt's misidentification, Defendant Jones questioned Mr. Benson.

**ANSWER:**    Defendants admit that Detective Jones questioned Benson. Defendants deny that Detective Jones conducted any unduly suggestive identification. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

92.    Mr. Benson—who was innocent—readily cooperated with IPD.

**ANSWER:**    Defendants deny that Benson was innocent. Defendants deny that he cooperated with IPD. Defendants deny any other allegations in this paragraph.

93.    Mr. Benson informed Defendant Jones of his verifiable alibi.

**ANSWER:**    Defendants admit only that Benson provided an alibi. Defendants deny that the alibi was "verifiable." Defendants deny any other allegations in this paragraph.

94.    Specifically, Mr. Benson informed Defendant Jones that he was in the nearby Priscilla Apartments at the time of the shooting.

**ANSWER:**    Defendants admit only that Benson gave an alibi, but state that the alibi was subsequently exposed as false. Defendants deny any other allegations in this paragraph.

95.    Mr. Benson named several people he interacted with that night and who were either with him in the hallway of the Priscilla Apartments when shots were fired outside or who saw him in the hallway of the building immediately after shots had been heard outside.

**ANSWER:**    Defendants admit only that Benson gave an alibi, but state that the alibi was subsequently exposed as false. Defendants deny any other allegations in this paragraph.

96.    Defendant Jones was not interested in the truth.

**ANSWER:**    Defendants deny the allegations in this paragraph.

97.    Rather, Defendant Jones was interested in clearing the Schoen case regardless of whether he sought to charge an innocent man.

**ANSWER:**    Defendants deny the allegations in this paragraph.

98.     Defendant Jones placed Mr. Benson under arrest for the murder.

**ANSWER:**    Defendants admit only that Benson was arrested for the murder. Defendants state that this arrest was based upon probable cause. Defendants deny any other allegations in this paragraph.

99.     At the time he initiated charges, Defendant Jones had not made a single attempt to verify Mr. Benson's alibi.

**ANSWER:**    Defendants state only that Detective Jones exposed Benson's alibi as false after Benson gave his statement. Defendants also state that, at the time of his arrest, Benson had been identified as the shooter by an eyewitness. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

**Donald Brooks Provides an "Official" Statement to Police—This Statement Contradicts Both the Original Statement He Allegedly Provided to Det. Jones as well as the Statement of Christy Schmitt**

100.     Defendant Jones obtained an "official" statement from Mr. Brooks late in the evening of August 14, 1998, after Mr. Benson had already been arrested.

**ANSWER**:    Defendants admit only that Detective Jones interviewed and obtained a recorded statement from Brooks. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

101.     According to Det. Jones's handwritten notes, Mr. Brooks stated that he observed the scene just before and just after the shooting but did not see the shooting itself.

**ANSWER:**    Defendants admit only that Detective Jones's notes speak for themselves. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

102.     Mr. Brooks's recitation of events conflicted in significant respects from the initial story attributed to him by Defendant Jones in his handwritten notes.

**ANSWER:**    Defendants deny the allegations in this paragraph.

103.    Mr. Brooks allegedly stated that, from his vantage point looking out the window of the second floor of nearby St. Regis Apartments, he saw "Detroit" (Benson) near the passenger side of Schoen's truck, and that "nobody else [was] there," but also stated that "Shirley [Gaskins] was standing across the street." A few moments later, Mr. Brooks said, after he had "[s]tepped away from the window," he "heard shots" and looked out the window again.

> **ANSWER:**    Defendants admit only that Detective Jones's notes speak for themselves. Defendants also admit that the notes indicate that Benson was "near the passenger side of Schoen's truck" shortly before the shooting. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

104.    At this point, even Mr. Brooks pointed the finger at **Joseph Webster**. According to Det. Jones's handwritten notes, Brooks said that "***Looney***"—the moniker for Joseph Webster—"went around the truck [&] headed for [the Priscilla Apartments]—a second subject went thru [sic] the Damien Center lot."

> **ANSWER:**    Defendants admit only that Detective Jones's notes speak for themselves. Defendants deny that the notes indicate that Brooks "pointed the finger at Joseph Webster" (emphasis omitted). Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

105.    After allegedly taking Brooks's account and recording it in handwritten notes, Defendant Jones then turned on the tape recorder and conducted the "official" statement in the early morning hours of August 15, 1998.

> **ANSWER:**    Defendants admit only that Detective Jones's notes and the recorded interview speak for themselves. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

106.    Significantly, the recorded statement omits any mention of "Looney" (Joseph Webster) at all.

**ANSWER:**    Defendants admit only that Detective Jones's notes and the recorded interview speak for themselves. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

107.    Defendant Jones deliberately omitted any reference to Looney as part of his quest to frame Mr. Benson for a crime he did not commit.

**ANSWER:**    Defendants deny the allegations in this paragraph.

108.    Det. Jones's handwritten notes containing Brooks's statement that **he saw *Looney* (Joseph Webster)** run from Schoen's truck immediately after hearing shots fired were never provided to the Marion County Prosecutor's Office nor to Mr. Benson prior to trial.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

**Another Eyewitness, Dakarai Fulton, Identifies Joseph Webster as the Shooter**

109.    On August 15, 1998, another eyewitness—Dakarai Fulton—came forward with information about the murder of Kasey Schoen.

**ANSWER:**    Defendants admit that Fulton was interviewed by Detective Jones as part of the homicide investigation. Defendants deny that Fulton "came forward" with information. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

110.    Defendant Jones first spoke to Fulton on August 15, 1998.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

111.    Defendant Jones wrote in his supplemental report: "Took prisoner Dakarai Fulton[] from the jail and conducted interview and showed photo arrays."

**ANSWER:**    Defendants state that Detective Jones's supplemental report speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

112.    There are no other notes or documents in the IPD File capturing the content of this initial interview with Mr. Fulton. However, a signed photo array dated August 15, 1998 reveals that Dakarai Fulton identified Joseph Webster from a photo array.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

113.    Defendant Jones omitted Fulton's identification from his supplemental report.

**ANSWER:**    Defendants state that Detective Jones's supplemental report speaks for itself. Defendants deny that Detective Jones intentionally "omitted" anything from his supplemental report as Fulton's recorded statement was disclosed in the prosecution. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

114.    Defendant Jones also omitted the information Fulton provided during the first interview that implicated Webster in the Schoen murder.

**ANSWER:**    Defendants state that Detective Jones's supplemental report speaks for itself. Defendants deny that Detective Jones intentionally "omitted" anything from his supplemental report as Fulton's recorded statement was disclosed in the prosecution. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

115.    Defendant Jones deliberately withheld this exculpatory evidence.

**ANSWER:**    Defendants deny the allegations in this paragraph.

116.    On August 17, 1998, Defendant Jones conducted a recorded interview of Fulton. In that interview, Fulton informed Defendant Jones that he witnessed the shooting death of Kasey Schoen from across the street while he was on his way to the Shell gas station at 16th and Illinois.

**ANSWER:**    Defendants state that Fulton's recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

117.    Fulton told Defendant Jones that he recognized the shooter because he had seen him around the neighborhood before, including earlier that day.

**ANSWER:**    Defendants state that Fulton's recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

118.    Fulton then identified Joseph Webster in a photo array as the person he saw shoot Kasey Schoen.

**ANSWER:**    Defendants state that Fulton's recorded and transcribed statement speaks for itself. Defendants deny that Fulton's statement reflects that he saw the face of the person who shot Schoen. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

119.    Fulton described Webster as wearing the same clothing that Ms. Schmitt had described to Defendant Van Buskirk right after Ms. Schmitt witnessed the murder. Fulton told Defendant Jones: "[H]e had on some black jogging pants and dark shirt, baseball cap, the pants had like three stripes, three white stripes on them."

**ANSWER:**    Defendants state that Fulton's recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

120.    Fulton also told Defendant Jones that he had run into Webster earlier on the day of the murder and that Webster was in possession of a .380 handgun.

**ANSWER:**    Defendants state that Fulton's recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

121.    Based upon the information he had available to him, Defendant Jones knew that Fulton's statement and identification of Webster were credible.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

122.    By this point, Defendant Jones knew that Mr. Benson was innocent and that Webster was Schoen's true killer.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

**Donald Brooks Identifies Joseph Webster and Says Webster was Near Schoen's Truck After the Shooting**

123.    So Defendant Jones conducted another interview of Donald Brooks.

**ANSWER:**    Defendants admit only that Detective Jones interviewed Donald Brooks. Defendants deny any other allegations in this paragraph.

124.    By this point, Defendant Jones knew that Mr. Brooks' initial implication of Mr. Benson lacked any credibility.

**ANSWER:**    Defendants deny the allegations in this paragraph.

125.    On August 17, 1998, Donald Brooks was re-interviewed by Defendant Jones.

**ANSWER:**    Defendants admit only that Detective Jones interviewed Donald Brooks. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

126.    In this re-interview, Mr. Brooks implicated Webster as the person involved in Schoen's murder.

**ANSWER:**    Defendants state that Brooks's statement speaks for itself. Defendants admit only that one of Brooks's statements identified Webster as being present at Schoen's murder. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

127.    In this re-interview, Brooks also identified Mr. Webster in a six-pack photo array.

**ANSWER:**    Defendants state that Brooks's statement speaks for itself. Defendants admit only that one of Brooks's statements identified Webster as being present at Schoen's murder. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

128.    Defendant Jones failed to document this interview where Mr. Brooks implicated

Webster in the Schoen murder.

**ANSWER:**    Defendants deny the allegations in this paragraph.

129.    Defendant Jones withheld this exculpatory evidence from the Marion

County Prosecutor's Office and Mr. Benson prior to trial.

**ANSWER:**    Defendants deny that this evidence is exculpatory, and Defendants deny that it was withheld. Defendants deny any other allegations in this paragraph.

**Evidence Implicating Joseph Webster Continues to Pour in but Is Ignored by IPD**

130.    In the weeks that followed, evidence implicating Webster as the shooter continued to pour in.

**ANSWER:**    Defendants deny the allegations in this paragraph.

131.    A note in Det. Jones's Supplemental Case Report states that on August 17, 1998 he "[a]ttempted to locate possible witness, Ladara Brewster, for statement re: Joseph Webster as second defendant."

**ANSWER:**    Defendants state that Detective Jones's supplemental report speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

132.    There is no other information about this witness in the IPD file, including the source of this tip or whether Defendant Jones ever made contact with this witness.

**ANSWER:**    Defendants state that Detective Jones's supplemental report speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

133.    The Supplemental Case Report, which contains the only mention of this witness, was never provided to the Marion County Prosecutor's Office nor Mr. Benson prior to trial.

**ANSWER:**    Defendants state that Detective Jones's supplemental report speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

134.    Then, on August 23, 1998, fellow IPD detective Randy West faxed Defendant Jones a handwritten note stating: "Loon[e]y runs with Eddie aka Bo... says he was present at shooting [and] saw Loon[e]y shot [sic] white guy in head. Eddie told this to Tameka Johnson in Apt.

109 of Academy Apts 1350 N. Meridian. Johnson told this to my [confidential informant]. Loon[e]y

also [] bragging (per CI info) about the shooting to his ex[-]girl[ ]friend, Jamie, who also lives in the

Academy[.]..."

> **ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

135.    Defendant Jones had every reason to believe that the CI's information was reliable

because it was consistent with the information he had uncovered earlier in his investigation.

> **ANSWER:**    Defendants deny the allegations in this paragraph.

136.    Defendant Jones *buried this evidence*—along with other critical documents implicating

Joseph Webster—in the IPD File, never providing this evidence to Mr. Benson, his trial counsel, or

to the Marion County Prosecutor's Office.

> **ANSWER:**    Defendants deny the allegations in this paragraph.

137.    But that wasn't the end of the evidence pointing to Joseph Webster.

> **ANSWER:**    Defendants deny that the evidence pointed only to Webster. Defendants deny any other allegations in this paragraph.

138.    On August 24, 1998, the day after Det. West faxed Defendant Jones his

handwritten note, Joseph Webster's then-girlfriend, Latasha Sheppard, reported to the IPD that her

.380 handgun had been stolen from inside her vehicle. She alleged that it had been stolen between

August 1 and August 11, 1998— Schoen was murdered on August 8.

> **ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

139.    The next day, on August 25, 1998, an anonymous informant made a Crime

Stoppers report to IPD stating that "Joseph Webster shot and killed Kasey Schoen." The informant

provided Webster's address at 2669 Cold Spring Manor Drive, where he stayed with Latasha

Sheppard at the time. The informant also stated that the gun Webster used belonged to Latasha

Sheppard.

> **ANSWER:**    Defendants stated that any Crime Stoppers report containing information from anonymous speakers speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

140.    On August 26, 1998, a second Crime Stoppers report came in from an informant

who stated that "Joe, boyfriend of Tashia [sic] is the one that shot Kasey Schoen... The gun belongs

to Tashia... Joe lives in the Cold Springs Manor Apartments...."

> **ANSWER:**    Defendants stated that any Crime Stoppers report containing information from anonymous speakers speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

141.    Defendants Jones and VanBuskirk failed to investigate any of these critical leads.

> **ANSWER:**    Defendants deny the allegations in this paragraph.

142.    Instead of conducting a legitimate investigation, Defendant Jones was only

concerned with closing his case.

> **ANSWER:**    Defendants deny the allegations in this paragraph.

143.    On or about August 27, 1998, Defendant Jones wrote in his supplemental report:

"The second suspect is still under investigation and at this time no charges have been filed.

However, with the arrest of Leon Benson I am clearing this case."

> **ANSWER:**    Defendants state that Detective Jones's supplemental report speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

### After Defendant Jones Closed His Shoddy Investigation, Yet Another Witness Implicating Looney Came Forward

144.    On September 9, 1998, after Det. Jones had apparently closed the investigation

into the shooting death of Kasey Schoen, another witness—Kenneth Brookings—came forward

with compelling new information about the murder. Mr. Brookings was interviewed by IPD

Sergeant Roy West.

> **ANSWER:**    Defendants admit only that Brookings was interviewed by Sgt. West. Defendants state that Brookings recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

145.    Mr. Brookings told Sergeant West his then-girlfriend Sherita Smith was involved in

a "hustle" on the night of August 8, 1998 in which the victim was a "white dude" from Plainfield.

Based on Ms. Smith's account, Mr. Brookings believed the victim was gay. Mr. Brookings told Det.

West that he believed Ms. Smith's co-conspirator in the "hustle" was "Looney," including because

Ms. Smith had come from the direction of The Varsity Lounge, which Mr. Brookings said was

Looney's "hang."

> **ANSWER:**    Defendants admit only that Brookings was interviewed by Sgt. West. Defendants state that Brookings recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

146. Mr. Brookings also told police that he knew Looney to carry a gun.

**ANSWER:** Defendants admit only that Brookings was interviewed by Sgt. West. Defendants state that Brookings recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

147. There is no record of any attempt by IPD to follow up on the information Mr. Brookings provided, even though his statements were consistent with their theory that Mr. Schoen was in the area because he was visiting a local gay bar on the night he was murdered.

**ANSWER:** Defendants admit only that Brookings was interviewed by Sgt. West. Defendants state that Brookings recorded and transcribed statement speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

### Defendants Buried a Veritable Glut of Exculpatory Evidence

148. As described above, Defendant Jones and other IPD Defendants buried a mountain of exculpatory evidence before Mr. Benson's trial.

**ANSWER:** Defendants deny that they withheld exculpatory evidence, and they state that the recorded and transcribed statements described above were disclosed to Benson's counsel prior to trial. Defendants deny any other allegations in this paragraph.

149. In addition to those items, Defendant Jones and the IPD never obtained or provided to Mr. Benson or to the State:

a.    A surveillance video from the crime scene from cameras on the nearby Saint Peter and Paul Parrish building that captured images of the shooting suspect;

b.    A surveillance video from the Academy Apartments;

c.    A surveillance video from The Varsity Lounge, which Det. Jones allegedly described to members of Kasey Schoen's family;

33

d.    The recording of the 911 call made by Christy Schmitt within minutes of the

shooting.

**ANSWER**:    Defendants deny that the surveillance video from Saints Peter and Paul Cathedral or the Academy Apartments was exculpatory. Defendants deny that any alleged video from the Varsity Lounge existed and, if any did exist, Defendants deny that it was exculpatory. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

150. Based on a woefully deficient investigation by the IPD—and without the benefit of the above-described cache of critical evidence implicating Joseph Webster—the State moved forward with its prosecution of the wrong man.

**ANSWER:**    Defendants deny that the IPD investigation was "woefully deficient" as two eyewitnesses identified Benson, also known as "Detroit," as the shooter. Defendants further deny that any exculpatory information was withheld, and, again, note that recorded and transcribed statements were provided to Benson's counsel. Defendants deny any other allegations in this paragraph.

**After His First Trial Ends in a Hung Jury, Mr. Benson is Wrongfully Convicted**

151. The State's case against Mr. Benson was weak. No physical, forensic, or DNA evidence linked Mr. Benson to the crime.

**ANSWER:**    Defendants deny the allegations in this paragraph.

152. Instead, the State's case rested on the cross-racial, stranger misidentification of Christy Schmitt, who witnessed the shooting from approximately 150 feet away in poor lighting conditions while in fear for her life, and the dubious testimony of Donald Brooks, who had been previously adjudicated mentally ill and whose description of the shooting had already changed before trial.

**ANSWER:**    Defendants deny that Schmitt witnessed the shooting from "approximately 150 feet away in poor lighting conditions" and further deny that her identification was not credible in any way. Defendants further deny that Brooks testimony was "dubious," that it

"changed before trial," and that his testimony otherwise lacked credibility. Defendants deny any other allegations in this paragraph.

153.    Mr. Benson's first jury trial took place from May 24-25, 1999.

**ANSWER:**   Defendants admit the allegations in this paragraph.

154.    On May 25, 1999, after several hours of deliberation, the jury foreman informed the Court that the jury was "deadlocked at 6 – Not Guilty[,] 1 – Undecided[,] 5 – Guilty... ." The Court declared a mistrial.

**ANSWER:**    Defendants admit only that the jury issued a note to the Court. The jury's note speaks for itself. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

155.    Leon Benson was tried a second time from July 6-July 8, 1999.

**ANSWER:**   Defendants admit the allegations in this paragraph.

156.    The State's case remained largely the same.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

157.    Christy Schmitt misidentified Leon Benson as the shooter.

**ANSWER:**   Defendants deny the allegations in this paragraph.

158.    Donald Brooks, however, attempted to recant his statement to IPD.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

159.    After dismissing Brooks, the prosecutor was permitted to read the entirety of Mr. Brooks's fabricated, out-of-court statement into the record, which included irrelevant, unsubstantiated, and highly prejudicial accusations that Mr. Benson had robbed Mr. Brooks. The state never charged Mr. Benson with this crime.

> **ANSWER:**    Defendants deny that Brooks's statement was "fabricated" and deny that any part of his testimony was "irrelevant, unsubstantiated, and highly prejudicial accusations." Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

160.    Mr. Benson argued that he was innocent. He put on witnesses who testified that, on the day of the shooting, he was wearing clothing that did not match the description of the shooter provided by Christy Schmitt. Defense witness Shirley Gaskin also testified that, after hearing shots on the night of August 8, 1998, she ran inside the Priscilla Apartments and saw Leon Benson on the steps inside the building.

> **ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

161.    Because of the actions of IPD, Mr. Benson was not able to counter the powerful force of Schmitt's misidentification—his defense was impossibly hampered without the evidence in the possession of the IPD demonstrating that the true perpetrator was Joseph Webster.

> ANSWER:    Defendants deny that "Joseph Webster" was the true perpetrator and deny that Benson was "innocent." Defendants deny that Schmitt misidentified Benson. Defendants deny that Benson was denied a fair trial. Defendants deny any other allegations in this paragraph.

**After Nearly a Quarter-Century of Wrongful Incarceration,
Mr. Benson is Exonerated in 2023**

162.    For the following twenty-four years, Mr. Benson remained wrongfully incarcerated in the harshest penal environments that Indiana had to offer, including spending over a decade in solitary confinement.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

163.    Mr. Benson never gave up hope, however. He steadfastly maintained his innocence, and pursued every post-conviction remedy available to him under Indiana law.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

164.    When the Marion County Prosecutor's Office announced the creation of its Conviction Integrity Unit in January 2021, Mr. Benson's was one of the first applications they received. The Marion County Prosecutor's Office Conviction Integrity Unit (MCPO CIU) accepted Mr. Benson's case for review.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

165.    A year-long joint reinvestigation between the MCPO CIU and Mr. Benson's advocates at the University of San Francisco School of Law Racial Justice Clinic (USF RJC) followed. That reinvestigation uncovered the above-described cache of critical, exculpatory evidence that was withheld from Mr. Benson in a clear violation of the dictates of Brady v. Maryland.

**ANSWER:**    Federal law, including the U.S. Supreme Court's decision in *Brady v. Maryland* speaks for itself. Defendants deny any "cache of critical, exculpatory evidence … was withheld from Mr. Benson." Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

166.    In the course of that reinvestigation, Defendant Jones agreed to be interviewed by the MCPO CIU and USF RJC attorneys. During those interviews, and in a subsequent sworn declaration, Defendant Jones admitted that it was his practice to withhold handwritten notes from witness interviews and handwritten notes from other law enforcement officers.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

167.    Defendants Jones admitted, among other things, that he did not disclose the handwritten note from Det. Randy West stating that he learned from a confidential informant that a previously unknown eyewitness was present at the shooting and saw "Looney" (Joseph Webster) shoot Kasey Schoen in the head.

**ANSWER:**    Defendants deny the allegations in this paragraph.

168.    Defendant Jones admitted that he failed to disclose other handwritten notes containing critical information implicating "Looney" (Joseph Webster) that was not otherwise contained in any of the evidence produced to Mr. Benson before trial.

**ANSWER:**    Defendants deny the allegations in this paragraph.

169.    Consistent with Defendant Jones's declaration, these materials were not contained in the MCPO file relating to the investigation and prosecution of the shooting death of Kasey Schoen. These materials do not appear on any State's discovery notices, and do not appear in the files maintained by Mr. Benson which contain the materials he received before trial.

**ANSWER:**    Defendants state that the discovery notices and other filings filed in Benson's criminal case speak for themselves. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

38

170.    The discovery of this Brady evidence also served to further demonstrate the woefully deficient investigation undertaken by IPD Defendants Jones and VanBuskirk, as there is no evidence that either of them followed up on the critical leads pointing to Joseph Webster.

**ANSWER:**    Defendants deny the allegations in this paragraph.

171.    Among other things, IPD Defendants failed to follow up with any of the four individuals identified by Det. Randy West in his note. Although IPD Defendants knew that "Eddie aka Bo" had witnessed Webster murder Schoen, they never asked Det. West to provide the last name of "Eddie aka Bo" or any other identifying information, including asking Det. West to follow up with the CI who provided that information. IPD Defendants never interviewed Tameka Johnson, who was identified in Det. West's note as a person to whom Mr. Webster confessed, nor did they track down Jamie, an ex-girlfriend of Mr. Webster's to whom he also confessed. Although the CI did not provide Jamie's last name, she would have been relatively easy to find because the CI identified her home as the Academy Apartments and her relationship to Mr. Webster. They never interviewed "Pinky" even though Det. West's note indicated she might have pertinent information and even provided her exact address. Nor did IPD Detectives interview Latasha Sheppard even though a Crime Stoppers report identified Ms. Sheppard as Mr. Webster's girlfriend and owner of the murder weapon, which she had reported stolen around the time that Schoen was murdered.

**ANSWER:**    Defendants deny the allegations in this paragraph.

172.    At the conclusion of the joint reinvestigation, the State admitted that the above-described critical, material evidence was never disclosed by IPD. The State admitted that this evidence was exculpatory and was withheld in violation of settled case law under Brady v. Maryland

and its progeny. The State conceded that it "no longer ha[d] confidence in the integrity of the

conviction in this matter."

> **ANSWER:**    Federal law, including the U.S. Supreme Court's decision in *Brady v. Maryland* speaks for itself. Defendants deny any "cache of critical, material evidence was never disclosed by IPD." Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

173.    On that basis, the State requested that the Marion County Superior Court grant Mr.

Benson's Petition for Post-Conviction Relief and vacate his conviction.

> **ANSWER:**    Defendants admit only that the Marion County Prosecutor's Office did not oppose Benson's most recent Petition for Post-Conviction Relief. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

174.    The Marion County Superior Court agreed. On March 8, 2023, the late Honorable

Shatrese Flowers granted Mr. Benson's Petition and vacated his conviction, finding: "The Brady

violations precluded [Mr. Benson] from pursuing a viable defense because the withheld materials

provided crucial support for the argument that it was [Joseph Webster] not Leon Benson, who shot

and killed Kasey Schoen.[] The cumulative effect of withholding [that] evidence resulted in a

violation of Leon Benson's due process rights after to him under the 5th and 14th Amendments to

the United States Constitution and Article 1 Section 12 & 13 of the Indiana Constitution..."

> **ANSWER:**    Defendants admit only that the Marion County Superior Court granted Benson's unopposed Petition for Post-Conviction Relief. Defendants state that they were not parties to that Petition. Defendants deny that they withheld exculpatory evidence. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

**After Mr. Benson's Exoneration, IMPD Sgt. Ricks Intentionally Inflicted**

**Emotional Distress Upon the Victim's Family**

175.    In addition to the substantial Brady evidence implicating Joseph Webster, the joint

reinvestigation between the MCPO CIU and the USF RJC uncovered additional new and troubling

evidence pointing to Webster as the true perpetrator of the murder of Kasey Schoen.

**ANSWER:**    Defendants deny that they withheld exculpatory evidence. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

176.    Following Mr. Benson's exoneration, the MCPO CIU provided the entire contents

of the file pertaining to the reinvestigation of Mr. Benson's conviction to the IMPD.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

177.    Plaintiff Kolleen Bunch, on behalf of the victim's family, maintained close contact

with members of the Indianapolis Metropolitan Police Department. In those conversations, Ms.

Bunch implored IMPD to hold the true killer responsible for her brother's death.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

178.    Instead of conducting a legitimate reinvestigation, however, Sgt. Columbus Ricks

engaged in extreme and outrageous conduct, making false and defamatory statements about Mr.

Benson to Ms. Bunch in an attempt to manipulate her and the victim's family into believing that: (1)

Mr. Benson is guilty of murdering Kasey Schoen; and (2) the MCPO CIU conducted a sham

investigation and released Mr. Benson without justification.

**ANSWER:**    Defendants deny engaging in extreme and outrageous conduct, deny making false and defamatory statements, and deny manipulating anyone. Defendants deny any other allegations in this paragraph.

179.    These false statements include, but are not limited to, statements that Leon Benson is the actual murderer and did not deserve a new trial, even going so far as to suggest that Defendant Ricks might "find more evidence to say Benson did it." These statements include:

a. "So I'm reviewing [the file]. I'm trying to get everything in order, then I'm going to write my supervision on – in the department on it, on how I feel about the case because to tell you the truth, and I'm going to be honest with you, I still don't understand why they let him out."
b. "So I – I'm going to be honest with you, I do not – I still do not understand why they overturned this, so – but I'm only through half the stuff that they have given me, and I'm going through it slowly."
c. "And then I'm looking at the court order and why the prosecution decided to vacate this conviction. And again, it's just my personal opinion: I don't think those are valid reasons. That's just my opinion. I just don't think so. They – they say – in—the court order, I think they said that Al is – Brady violations, the identity, how close they looked to each other, based on those two things and then the testimony from the one girl who – who claims that Benson was in the apartment building with them. Based on those things, they don't have confidence in the conviction anymore. That's what I'm reading. And so I disagree with that."
d. "And then they will get in touch with you and talk to you about it. There's nothing I can do as far as the prosecution officer. I have no power to get them to change their mind in anything. And then I will tell you this, and you can ask any lawyer you want to: They dismissed this with prejudice, which means that they will not go back and retry the case, even if I find more evidence to say Benson did it. So that's where we are."

**ANSWER:**    Defendants deny making any false statements. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

180. At the time Defendant Ricks made these statements, he knew them to be false.

**ANSWER:**    Defendants deny the allegations in this paragraph.

181. Defendant Ricks made such statements as part of Defendants' ongoing conspiracy to frame Mr. Benson for crimes he did not commit and to continue covering up egregious police misconduct within the IPD and/or its successor the IMPD.

**ANSWER:** Defendants deny making any false statements. Defendants deny any "ongoing conspiracy to frame Mr. Benson for crimes he did not commit and to continue covering up egregious police misconduct within the IPD and/or its successor the IMPD." Defendants deny any other allegations in this paragraph.

182. Defendant Ricks made further outrageous and offensive statements which include, but are not limited to, statements where Defendant Ricks asks to speak with the Schoen family regarding his beliefs that Leon Benson is the actual murderer and did not deserve a new trial:

a. "I can tell you what I can do, is I can sit down, if you want me to, meet with you and your family and go through everything that the prosecution showed me, and so you can be versed with everything that they did. And I'm going to be honest with you, I just don't see the reasons they see to have dismissed this case...So I just don't see it."

b. "I have no problem with that. Do you want [to] speak with your brothers or...family members you want to talk to and come in and talk to me. I will – I would sit that down and go through every one of these statements with you and show that, to me, I don't see – I don't see why they overturned the conviction."

**ANSWER:** Defendants deny making any false statements. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

183. Defendant Ricks made further outrageous and offensive statements which include, but are not limited to, statements that the MCPO CIU agreed to Mr. Benson's exoneration without justification for doing so:

a. "The people who are supposed to fight for us are the prosecutors, okay? And they turned around and didn't fight in this case for the citizens of this county. They sat and said, I agree with this people who come in from California, and so we're not going to do nothing. So it was – it's no recourse for me as a homicide detective. I can't go to them and say, "well, wait a minute, I got this, this, this that and the other," because they say no, okay? So I have no recourse. I don't – I don't know, as far as you and your family and what recourse you have in this

matter. There may be some, and I would ask – say, go talk to an attorney and see if there's any recourse. After you speak to me, and I'll show you everything, you can go speak to somebody."

**ANSWER:**    Defendants deny making any false statements. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

184.    Defendant Ricks made further outrageous and offensive statements which include, but are not limited to, statements that Mr. Benson's constitutional rights were not violated by the withholding of exculpatory evidence falsely stating that "we disclosed all the information in those notes" [that Jones did not turn over]:

    a. "But from my point of view, us as police officers, our recourse is the prosecutor's office. We go to the prosecutor's office and say, "Hey, no, this was a rightful case and this was done correctly, and these people did identify him." And what this company out of California is saying – it really does not bear anything. I mean, they said the Brady violation by Detective Jones – well, back during that time period, we did not have to give our personal, written notes as long as we disclosed all the information in those notes. And I can tell you, I'll go through his whole notebook, and there's not one bit of information in that notebook that didn't get passed on to the prosecutor's office. Everything."

**ANSWER:**    Defendants deny making any false statements. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

185.    Defendant Ricks made further outrageous and offensive false statements which include, but are not limited to, statements that the Marion County Prosecutor's Office Conviction Integrity Unit agreed to Mr. Benson's exoneration without justification for doing so, lied to the Court, and did so for political gain:

    a. "And so I just think that – my personal opinion is: This prosecution has been pushing this Integrity Unit of theirs that didn't have any wins. They thought that this would be a case that they could get a win on, and they went for it. I don't think that this is a good case at all. I don't think that they –I don't think they presented the case honestly to the judge."

    b. "So that's my honest – that's my opinion. It's not the police department's opinion. I don't want you to get this mixed up. This is my personal opinion."

**ANSWER:** Defendants deny making any false statements. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

186. Defendant Ricks made further outrageous and offensive false statements which include, but are not limited to, statements that Detective Jones was pressured into admitted that evidence was withheld and falsely asserting that at the time, Detective Jones was enfeebled and "in a nursing home."

    a. "But you're talking about a guy who's 75 years old that's had a stroke, and he lives – he's in a nursing home now, okay? So I think that they – they pressured him into saying things. And, you know, he, like me, think the prosecutors – prosecution is on my side because that's who is my lawyer, is the prosecutor, you know?"

**ANSWER:** Defendants deny making any false statements. Defendants state that Detective Jones medical records will speak for themselves. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

187. In fact, as of late June 2023—more than a year after his initial interview with Benson's representatives—Detective Jones was still living in his own home.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

188. Defendant Ricks made further outrageous and offensive statements which include, but are not limited to, statements that the Marion County Prosecutor's Office Conviction Integrity Unit agreed to Mr. Benson's exoneration without justification for doing so, lied to the Court, and did so for political gain:

    a. "I just don't trust the judgment of the prosecutor's office in this case, and that's my personal opinion. And so I'm willing to sit down with you and go through everything that they sent me, just to show you why I feel that way. And then I don't – I don't know of a recourse itself for the fact that you can go talk to your lawyer and see if there is a recourse for you or your family in this."

**ANSWER:**    Defendants deny making any false statements. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

### The City of Indianapolis Failed to Provide Sufficient Training and Supervision to Avoid Brady Violations and Has Exhibited Deliberate Indifference as to Whether or Not Brady Violations Will Continue to Occur

189.    Mr. Benson's wrongful conviction and the constitutional injuries he suffered were caused by the policies and practices of the IPD and its successor the Indianapolis Metropolitan Police Department (IMPD).

**ANSWER:**    Defendants deny the allegations in this paragraph.

190.    In his sworn declaration, Defendant Jones described policies and practices which resulted in the improper withholding of exculpatory materials.

**ANSWER:**    Defendants deny the allegations in this paragraph.

191.    Those practices include, but are not limited to, withholding handwritten notes from witness interviews and withholding handwritten notes from other law enforcement officers, even when those materials contained plainly exculpatory evidence.

**ANSWER:**    Defendants deny the allegations in this paragraph.

192.    Defendant Jones also withheld and failed to preserve and/or disclose other critical evidence as described above.

**ANSWER:**    Defendants deny the allegations in this paragraph.

193.    These practices can only be explained by a failure by the City of Indianapolis to properly train and supervise officers or to otherwise intervene to prevent this blatant misconduct.

**ANSWER:**    Defendants deny the allegations in this paragraph.

194.    Defendant Jones investigated over fifty homicides over the course of his career working for the IPD. By his own admission, his failure to disclose potentially exculpatory evidence was a pattern and practice.

**ANSWER:**    Defendants admit only that Detective Jones has estimated he investigated over fifty homicides during his career. Defendants deny the allegations in this paragraph.

195.    Consistent with that pattern and practice, Defendant VanBuskirk's handwritten notes were also not disclosed to Mr. Benson before trial.

**ANSWER:**    Defendants deny the allegations in this paragraph.

196.    The City of Indianapolis and the IPD failed to train its detectives on these basic law enforcement functions—functions necessary for the protection of a criminal defendant's constitutional rights—and/or failed to supervise its officers tasked with carrying out this serious responsibility.

**ANSWER:**    Defendants deny the allegations in this paragraph.

197.    Those policies and practices were the proximate cause of the constitutional injuries that Mr. Benson sustained, as described more fully herein.

**ANSWER:**    Defendants deny the allegations in this paragraph.

198.    Moreover, the City's failure to train its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Mr. Benson in this case.

**ANSWER:**    Defendants deny the allegations in this paragraph.

199.    Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

**ANSWER:**    Defendants deny the allegations in this paragraph.

**Mr. Benson's Damages**

200.    Mr. Benson spent over twenty-four years in prison for a crime that he did not commit. Over ten years of that time in custody was spent in solitary confinement.

**ANSWER:**    Defendants admit only that Benson was sent to prison. Defendants deny that he was convicted for a crime he did not commit. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

201.    During his wrongful incarceration, Mr. Benson was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to raise his children and grandchildren, share holidays, births, funerals and other life events with loved ones, and the fundamental freedom to live his life as an autonomous human being.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

202.    As a result of his wrongful incarceration, Mr. Benson must now attempt to rebuild his life all without the benefit of nearly a quarter-century of life experience that ordinarily equip adults for that task.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

203.    Mr. Benson has suffered tremendous damage, including physical pain suffering and emotional damages, all proximately caused by Defendants' misconduct.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny the same.

### Ms. Bunch's Damages

204.    While Mr. Benson lost nearly twenty-five years of freedom, Ms. Bunch has suffered an equally tragic loss: the loss of her brother, for which Defendant Ricks and the IMPD refuse to hold the true killer responsible or even investigate in good faith.

**ANSWER:**    Defendants admit only that Kasey Schoen was murdered. Defendants deny that "IMPD refuse to hold the true killer responsible or even investigate in good faith. Defendants deny the allegations in this paragraph.

205.    The reckless and outrageous statements made by Defendant Ricks were designed to manipulate the victim's family into publicly questioning the legitimacy of the MCPO CIU's decision to exonerate Mr. Benson.

**ANSWER:**    Defendants admit only that Kasey Schoen was murdered. Defendants deny that "IMPD refuse to hold the true killer responsible or even investigate in good faith." Defendants deny the other allegations in this paragraph.

206.     Over the several months in 2023 during which Ms. Bunch was in contact with Defendant Ricks, and in the intervening months since that time, Defendant Ricks caused Ms. Bunch to suffer physical pain, severe emotional distress, and mental anguish.

**ANSWER:**     Defendants deny that they violated any state or federal laws. Defendants lack knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph and therefore deny the same.

### Benson Count I - 42 U.S.C. § 1983
### Due Process

207.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     Defendants incorporate their answers to paragraphs 1 through 206 as if fully restated herein.

208.     As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Benson of his constitutional right to a fair trial.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

209.     In the manner described more fully above, the Defendants conducted a reckless investigation, deliberately withheld exculpatory evidence, and manipulated reports to implicate Mr. Benson and obscure the evidence pointing to the true perpetrator. Absent this misconduct, the prosecution of Mr. Benson could not and would not have been pursued.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

210.    The Defendants' misconduct also directly resulted in the unjust criminal conviction of Mr. Benson, thereby denying him of his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

211.    As a result of this violation of his constitutional right to a fair trial, Mr. Benson suffered injuries including but not limited to emotional distress and pain and suffering, as is more fully alleged above.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws. Defendants deny that Benson is entitled to any relief whatsoever.

212.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Benson's constitutional rights.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

213.    The misconduct described in this Count was undertaken pursuant to routine practice of the Indianapolis Police Department to pursue wrongful convictions through reckless and profoundly flawed investigations, provision of fabricated and manipulated evidence and reports, and withholding exculpatory evidence. In this way, the municipal defendants violated Mr. Benson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

51

214.    These widespread practices, so well-settled as to constitute de facto policy in the IPD, were able to exist and thrive because municipal policymakers with authority over the IPD exhibited deliberate indifference to these problems, thereby effectively ratifying them.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

215.    The practices described in the preceding paragraphs were allowed to flourish because the municipal Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

### Benson Count II – 42 U.S.C. § 1983
### Malicious Prosecution

216.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 215 as if fully restated herein.

217.    As described more fully above, the Defendants, individually, jointly and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Mr. Benson of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

218.    In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Mr. Benson for these crimes, for which prosecution there was no probable cause and which caused Mr. Benson to suffer a deprivation of liberty. Defendants' misconduct included fabricating and manipulating evidence and withholding exculpatory evidence.

> **ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

219.    The Defendants' misconduct directly resulted in the unlawful prosecution and incarceration of Mr. Benson, thereby denying him of his liberty in violation of his constitutional rights.

> **ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

220.    Absent the misconduct of Defendants, Mr. Benson would never have been prosecuted by the Marion County Prosecutor's Office.

> **ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

221.    As described more fully above, the criminal proceedings against Mr. Benson were ultimately resolved in Mr. Benson's favor. The MCPO filed joint stipulations with Mr. Benson's attorneys conceding that his constitutional rights have been violated.

> **ANSWER:**    Defendants admit only that the criminal charges against Benson are now dismissed. Defendants deny the other allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

222.    The Marion County Superior Court agreed that Mr. Benson's constitutional rights have been violated, and the Court recognized the MCPO's admission that it no longer has confidence in the integrity of the case against Mr. Benson. The MCPO then dismissed the charges against Mr. Benson with prejudice.

**ANSWER:**    Defendants admit only that the criminal charges against Benson are now dismissed. Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

223.    Because of this violation of his constitutional rights, Mr. Benson suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

224.    The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Benson's constitutional rights.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

225.    The misconduct described in this Count was undertaken pursuant to a routine practice of the IPD to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and by fabricating, manipulating, and/or withholding evidence. In this way, the municipal defendants violated Mr. Benson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

226.    These practices, so routine so as to constitute de facto policy in the IPD, could exist and thrive because municipal policymakers with authority over the IPD exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

227.    The practices described in the preceding paragraphs could flourish only because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

### Benson Count III – 42 U.S.C. § 1983
### Fourth and Fourteenth Amendments Fabrication of False Evidence

228.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 227 as if fully restated herein.

229.    In the manner described more fully above, the Defendants, individually, jointly and in conspiracy with each other, fabricated and manipulated evidence, including without limitation, false and misleading police reports. The Defendants knowingly fabricated and manipulated this evidence.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

230.     There is no question that the false, fabricated, and manipulated evidence presented by the IPD to the MCPO affected that state's decision to pursue criminal charges against Mr. Benson.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

231.     Defendants were acting under color of law and within their scope of employment when they took these actions.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

232.     The Defendants' misconduct directly resulted in the unjust continued incarceration of Mr. Benson, thereby denying each of his constitutional right to due process as guaranteed by the U.S. Constitution. Absent this misconduct, there would have been no probable cause for Mr. Benson's continued detention, and the prosecution of Mr. Benson could not and would not have been pursued.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

233.     As a direct and proximate result of the Defendant' actions, Mr. Benson's constitutional rights were violated, and he suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

**Benson Count IV – 42 U.S.C. § 1983 Supervisory Liability**

234.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 233 as if fully restated herein.

235.    The continued wrongful detention of Mr. Benson was caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendant Garner, when he failed to adequately train and supervise the individual Defendants.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

236.    Specifically, the supervisory defendant knew or, in the absence of their deliberate indifference and recklessness, should have known of its subordinates' unconstitutional actions and related misconduct in this case and others.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

237.    Furthermore, the supervisory Defendant failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those concerning the production of exculpatory evidence, the preparation of law enforcement reports, and the minimum standards of investigative diligence, thereby encouraging and/or permitting these employees and other Defendants to engage in a reckless investigation, to withhold exculpatory and impeachment evidence, and to manipulate and fabricate evidence, which caused the constitutional deprivations suffered by Mr. Benson.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

238.    These failures, which included withholding exculpatory evidence and engaging in fabrications and other investigative misconduct, were contrary to accepted methods used by law enforcement agencies. The fact that the Defendant supervisor failed to train and supervise subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Benson's constitutional rights.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

239.    The personal involvement of the Defendants' supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Benson, including the above-mentioned injuries and damages.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

240.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Benson's clearly established constitutional rights.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

## Benson Count V - 42 U.S.C. § 1983
## Failure to Intervene

241.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 240 as if fully restated herein.

242.    In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

243.    Because of the Defendant Officers' failure to intervene to prevent the violation of Mr. Benson's constitutional rights, Mr. Benson suffered pain and injury, as well as emotional distress.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

244.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Benson's rights.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

245.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Indianapolis Police Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the Municipal Defendants with final policymaking authority.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

**Benson Count VI – Bunch Count I**
**42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

59

246.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 245 as if fully restated herein.

247.    Defendants Jones, VanBuskirk, and others reached an agreement amongst themselves to deprive Mr. Benson of his constitutional rights and to continuously deprive him of his liberty, all as described in the various Paragraphs of this Complaint.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

248.    Following Mr. Benson's exoneration, Defendants Ricks and McAllister joined the conspiracy to defend Mr. Benson's wrongful conviction in order to bury evidence of police misconduct, protect the IPD and the City of Indianapolis from civil litigation, and to protect other criminal prosecutions in which Joseph Webster was a used a witness.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

249.    As part of this conspiracy to defend Mr. Benson's wrongful conviction, Defendant Ricks outrageously and recklessly made false statements to Ms. Bunch, described more fully above, that caused serious emotional harm.

**ANSWER:**    Defendants deny making any false statements. Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

250.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

251.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

252.     As a direct and proximate result of the illicit prior agreement referenced above, Mr. Benson's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

253.     As a direct and proximate result of the illicit prior agreement referenced above, Ms. Bunch suffered severe emotional distress and aguish, as is more fully alleged above.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

254.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

255.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the IPD and/or its successor the IMPD in the manner described more fully in the

preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with

final policymaking authority.

>**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically,
>deny that they violated any state or federal laws.

### Benson Count VII - 42 U.S.C. § 1983
### Monell Claim Against Defendant City of Indianapolis

256.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

>**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 255 as if fully
>restated herein.

257.    The actions of the Indianapolis Police Officers in withholding material exculpatory

information from Mr. Benson and his counsel were undertaken pursuant to the policies and

practices of the IPD and/or its successor the IMPD, described above, which were created,

maintained, or ratified by policymakers for the City of Indianapolis with final policymaking

authority.

>**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically,
>deny that they violated any state or federal laws.

258.    The policies and practices described in this Count were maintained and

implemented by the City of Indianapolis with deliberate indifference to Mr. Benson's constitutional

rights.

>**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically,
>deny that they violated any state or federal laws.

259.     As a direct and proximate result of the City of Indianapolis's actions, Mr. Benson's

constitutional rights were violated and he suffered injuries and damages, as set forth in this

Complaint.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically,
deny that they violated any state or federal laws.


260.     The City of Indianapolis is therefore liable for the misconduct committed by its

officers.

**ANSWER:**     Defendants deny the allegations in this paragraph and, more specifically,
deny that they violated any state or federal laws.

## STATE LAW CLAIMS
### Benson Count VIII
### Negligent Supervision

261.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     Defendants incorporate their answers to paragraphs 1 through 260 as if fully
restated herein.


262.     The Municipal Defendants, as well as supervisory Defendant Garner, had a duty to

properly train and supervise officers, detectives, and supervisor employees of the Indianapolis Police

Department and to provide adequate policies to prevent the above conduct, including concealing

and withholding exculpatory evidence, fabricating and manipulating evidence, and failing to conduct

a constitutionally adequate investigation.

**ANSWER:**     Defendants state that Indiana law speaks for itself, particularly with regard to
Defendants legal duties. Defendants deny the other allegations in this paragraph and, more
specifically, deny that they violated any state or federal laws.

263.    The Municipal Defendants and the supervisory Defendant were grossly negligent in the training, supervision and discipline of the Defendant Officers, resulting in Mr. Benson being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

264.    Because of this misconduct, Mr. Benson suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

**Benson Count IX**
**Respondeat Superior**

265.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 264 as if fully restated herein.

266.    In committing the acts alleged in the preceding paragraphs, the Defendants were members and agents of the Indianapolis Police Department, acting at all relevant times within the scope of their employment.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

267.    Defendant City of Indianapolis is liable as principal for all state law torts

committed by its agents.

**ANSWER:**    Defendants state that Indiana law speaks for itself. Defendants deny the
other allegations in this paragraph and, more specifically, deny that they violated any state or
federal laws.

**Benson Count X**
**Intentional Infliction of Emotional Distress**

268.    Mr. Benson hereby incorporate by reference the foregoing paragraphs and further

allege as follows.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 267 as if fully
restated herein.

269.    Defendants intentionally and/or recklessly, directly and proximately caused Mr.

Benson, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in

breach of the duties they owed to Mr. Benson to refrain from a) withholding material, exculpatory

and impeachment evidence, b) fabricating and manipulating evidence, c) failing to preserve evidence,

d) failing to conduct a constitutionally adequate investigation, and e) maliciously prosecuting Mr.

Benson and causing his false arrest and imprisonment.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically,
deny that they violated any state or federal laws.

270.    The Defendants' actions caused Mr. Benson to suffer physical harm, including

physical ailments and unauthorized physical contact resulting from the circumstances and duration

of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial

and post-conviction incarceration.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

271.    The Defendants' actions caused Mr. Benson to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

### Benson Count XI
### Defamation per se

272.    Mr. Benson hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 271 as if fully restated herein.

273.    Defendant Columbus Ricks made false and defamatory statements about Mr. Benson that injure his reputation and excite derogatory feelings or opinions about him in violation of Indiana state law, including statements that he is guilty of a serious crime.

**ANSWER:**    Defendants deny that they made any false and/or defamatory statements. Defendants deny the other allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

274.    Defendant Ricks repeatedly made these false statements to Ms. Bunch, stating that Mr. Benson is the actual murderer of Kasey Schoen and that Mr. Benson did not deserve a new trial, even going so far as to suggest he might "find more evidence to say Benson did it."

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

275.    Mr. Benson suffered humiliation, personal embarrassment, mental and emotional

distress, and other harm and damages as a result of Defendant Ricks's unlawful actions.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

## Bunch Count II
### Intentional Infliction of Emotional Distress

276.    Ms. Bunch hereby incorporates by reference all the foregoing paragraphs and

further alleges as follows.

**ANSWER:**    Defendants incorporate their answers to paragraphs 1 through 275 as if fully restated herein.

277.    Defendant Ricks, engaged in extreme and outrageous conduct which intentionally

and/or recklessly caused Ms. Bunch—and her family—severe emotional distress.

**ANSWER:**    Defendants deny the allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

278.    Defendant Ricks made outrageous and offensive statements to Ms. Bunch as part

of his attempt to manipulate the victim's family into believing that a) Mr. Benson is guilty of the

murder of Kasey Schoen, and b) the Marion County Prosecutor's Office Conviction Integrity Unit

conducted a faulty investigation and released Mr. Benson without justification.

**ANSWER:**    Defendants deny that they made any outrageous and/or offensive statements. Defendants deny the other allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

279.    These outrageous and offensive statements include, but are not limited to, statements that Leon Benson is the actual murderer and did not deserve a new trial, and suggesting that Defendant Ricks might "find more evidence to say Benson did it."

**ANSWER:**    Defendants deny that they made any outrageous and/or offensive statements. Defendants deny the other allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

280.    These outrageous and offensive statements also include statements that the Marion County Prosecutor's Office Conviction Integrity Unit agreed to Mr. Benson's exoneration without justification for doing so, lied to the Court, and did so for political gain, as described more fully above.

**ANSWER:**    Defendants deny that they made any outrageous and/or offensive statements. Defendants deny the other allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

281.    The reckless and outrageous statements made by Defendant Ricks caused Ms. Bunch to suffer physical pain, severe emotional distress, and mental anguish, including ongoing depression and the continued effects of post-traumatic stress disorder.

**ANSWER:**    Defendants deny that they made any outrageous and/or offensive statements. Defendants deny the other allegations in this paragraph and, more specifically, deny that they violated any state or federal laws.

**WHEREFORE**, Plaintiffs LEON BENSON and KOLLEEN BUNCH, respectfully request that this Court enter judgment in their favor and against Defendants CITY OF INDIANAPOLIS, ALAN F. JONES, LESLIE VANBUSKIRK, STEVEN GARNER, ELI MCALLISTER, and COLUMBUS RICKS awarding compensatory damages, attorneys' fees, and

costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**ANSWER:**     Defendants deny that Plaintiffs are entitled to any relief whatsoever.

## JURY DEMAND

Plaintiffs, LEON BENSON and KOLLEEN BUNCH, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**ANSWER:**     Plaintiffs have demanded a trial by jury, and no response from Defendants is required. Defendants also demand trial by jury.

## DEFENSES

Defendants, for their Defenses, state as follows:

1.     Defendants deny each and every allegation contained in Plaintiff's Complaint which is not specifically admitted herein.

2.     Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

3.     Plaintiffs may not be the real party in interest and may lack prudential standing to assert the claim herein.

4.     The individual Defendants are entitled to qualified immunity.

5.     Plaintiffs have failed to mitigate damages.

6.     To the extent that Plaintiffs have received or does receive payments for either of their alleged injuries and damages, any such payments constitute satisfaction and must be set-off against any recoveries made in this litigation.

7.     Plaintiffs' claims are barred, in whole or in part, to the extent their claims are outside the scope of their notice(s) of tort claim.

8.      Plaintiffs' state law claims are barred to the extent they have failed to comply with the notice requirements of the Indiana Tort Claims Act, Indiana Code section 34-13-3-1, *et seq.*

9.      To the extent that Plaintiffs' lawsuit alleges state tort claims, Defendants are immune under Indiana's Tort Claim Act, Indiana Code section 34-13-3-3, *et seq.*, including but not limited to, immunities for law enforcement and discretionary functions.

10.     Plaintiff may not recover damages on any state law claims against any individual for the acts committed within the scope of his or her employment.

11.     Plaintiffs' claims are barred because the Plaintiffs' alleged injuries, damages, or losses, were directly and proximately caused by the intervening acts, superseding acts, and conduct of people who were not acting as agents or employees of the City.

12.     Plaintiffs' right to recovery, if any, is limited under federal and state law. Defendants' combined aggregate liability may not exceed the cap identified in Indiana Code § 34-13-3-4.

13.     To the extent that Plaintiffs' Complaint seeks punitive damages, these claims are barred against a governmental employee or entity under state law.

14.     Plaintiffs' claims for attorneys' fees are barred by Indiana law.

15.     Defendants' alleged acts or failures to act were not the cause or proximate cause of Plaintiffs' alleged damages.

16.     There was no policy, practice or procedure that was the cause of Plaintiffs' injuries.

17.     Plaintiffs are not entitled to a jury trial on issues where there is no federal right to a jury trial, including equitable issues and relief.

18.     Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations, waiver, estoppel and/or the doctrine of laches.

19.     To the extent that any Co-Defendants assert affirmative or additional defenses applicable to City Defendants, Defendants incorporate those herein by reference.

20.    Defendants are continuing their investigation and study of all facts and circumstances of the subject matter of the Complaint, and accordingly, reserves the right to amend, modify, revise or supplement its answer, and to plead such further defenses and take such further actions as they may deem proper and necessary in its defense upon the completion of such investigation and study.

WHEREFORE, Defendants, City of Indianapolis, Leslie VanBuskirk, Steven Garner, Eli McAlister, and Columbus Ricks, having fully answered Plaintiff's Complaint, pray that judgment be entered in their favor and against Plaintiff, or alternatively, that Plaintiff's claims be dismissed with prejudice, and that Defendants be permitted to recover their costs incurred herein, including reasonable attorney's fees incurred in defense of this action and for all other just and proper relief.

FROST BROWN TODD LLP

By:    / s / Alexander P. Will
       Anthony W. Overholt, #16481-49
       Alexander P. Will, #23474-49
       111 Monument Circle, Suite 4500
       P.O. Box 44961
       Indianapolis, IN  46244-0961
       Telephone:    (317) 237-3800
       Facsimile:    (317) 237-3900
       Email:  aoverholt@fbtlaw.com
               awill@fbtlaw.com

       *Attorney for Defendants City of Indianapolis, Leslie VanBuskirk, Steven Garner, Eli McAlister, and Columbus Ricks.*

LR02314.0779895  4880-5734-9073v7

71